UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AMY L. KETTERING,            )
                             )
          Plaintiff,         )
                             )
     v.                      )     No.  4:11CV646 RWS
                             )                  (FRB)
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                             )
          Defendant.         )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is before the Court on appeal of an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

### I.  Procedural History

On May 6, 2008, plaintiff Amy L. Kettering filed an application for Disability Insurance Benefits pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which she claimed she became disabled on September 26, 2003. (Tr. 81-87.) On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 43-44, 47-51.) On October 26, 2009, a hearing was held before an Administrative Law Judge (ALJ) at which plaintiff testified and was represented by counsel. (Tr. 23-42.) On November 23, 2009, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 8-19.) On March 10, 2011, after consideration of additional evidence, the Appeals Council denied

plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the hearing on October 26, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-two years of age. Plaintiff stands five feet, four inches tall and weighs 170 pounds. Plaintiff is married and has a five-year-old child. Plaintiff graduated from high school. Plaintiff has received no other vocational or technical training. (Tr. 26-27.)

Plaintiff's Work History Report shows plaintiff to have worked as a food worker at a restaurant from 1995 to 1996. From 1996 to 1997, plaintiff worked as a daycare worker at a child care facility, as well as a cashier in retail and at a grocery store. In 1997, plaintiff worked as an operator at an electrical plant. From 1998 to 2001, plaintiff worked as an assistant manager at Amoco. In 2001, plaintiff also worked as a bank teller. From 2001 to June 2003, plaintiff worked as a receptionist at a law firm. (Tr. 111-19.)

Plaintiff testified that she was involved in an automobile accident in September 2003 which caused her to sustain injuries to her left foot and both knees. Plaintiff testified that she did not return to work for any length of time after the accident due to multiple surgeries and therapy sessions, as well as

-2-

on account of pain. Plaintiff testified that she has had four surgeries on the left knee but that the condition of her knee has worsened. Plaintiff testified that she cannot straighten her left knee. Plaintiff testified that she hears popping and cracking when she walks; that she has difficulty rising from a seated position and must stretch before she does so; and that she cannot squat, kneel or run. Plaintiff testified that she was recently advised that she needed additional knee surgery, but that she could not undergo a knee replacement on account of her age. Plaintiff testified that she has been seeing a pain management specialist for two years, and that the current treatment regimen for her knee consisted of rest and applying ice packs. (Tr. 30-33.)

Plaintiff testified that she experiences pain in her right hip on account of overcompensation for her left knee condition. Plaintiff testified that she feels as though her hip is "ripping in half." Plaintiff testified that x-rays and MRI's show her hips to be uneven. Plaintiff testified that she experiences pain shooting down her right leg from her hip. Plaintiff testified that she is constantly shifting her gait on account of the pain and that she can stand for only five to ten minutes before she must sit or lie down. Plaintiff testified that she also experiences pain while driving on account of the use of the right foot to press on the brake and gas pedals. Plaintiff testified that she applies heat to her hip. Plaintiff testified that with the pain in her left knee and in her right hip, she is constantly shifting

positions.  (Tr. 30-35.)

Plaintiff also testified that she has suffered from psoriasis since she was a child and has now been diagnosed with psoriatic arthritis which attacks her joints.  Plaintiff testified that the arthritis has exacerbated the pain in her right knee and has affected all of her joints, including her back.  (Tr. 33.) Plaintiff testified that the condition causes her wrists to sometimes feel as though they are broken.  (Tr. 35.)  Plaintiff testified that she is more comfortable when her hands are clenched in a fist position.  Plaintiff testified that she experiences shooting pain in her fingers, hands, wrists, and elbows when her hands are in an open position.  Plaintiff testified that she sees a rheumatologist for the condition and has taken medication which has been ineffective.  Plaintiff testified that she is waiting to start a new medication.  (Tr. 36-37.)

As to her daily activities, plaintiff testified that she awakens in pain.  Plaintiff testified that she gets up to feed her three dogs, but that she does so slowly because of the pain. Plaintiff testified that she then watches movies with her daughter, lying on the couch with her heating pad and ice pack.  As to housework, plaintiff testified that she must vacuum because of one dog that sheds, but that she does such work after she takes her pain medication.  Plaintiff testified that she is also able to load the dishwasher.  Plaintiff testified that she folds laundry but does not carry the laundry basket up and down the stairs.

Plaintiff testified that her cooking consists of preparing meals in the toaster oven because she can no longer stand at the kitchen counter or chop food on account of pain. Plaintiff testified that she sometimes cannot open jars or DVD cases. Plaintiff testified that she drives only to go to the bank or to Wal-Mart for groceries. Plaintiff testified that, if she pushes herself, she can shop for up to twenty minutes but that she then must come home and lie on the couch with a heating pad. (Tr. 34-35.) Plaintiff testified that she does not belong to a church or any other group, but that friends sometimes come to the house. Plaintiff testified that she cannot help her child with a bath because she cannot bend over the tub, but that she can sometimes help with a shower if the pain does not prevent her from doing so. Plaintiff testified that prior to her injury, she engaged in various activities such as sky diving and exercising at a gym, but that she is no longer able on account of pain. (Tr. 38-41.)

### III. Medical Records[1]

On September 26, 2003, plaintiff was transported by

---

[1]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes dated September 8, 2009, through July 6, 2010, from Piper Spine Care, St. Joseph's Hospital West, St. Peter's Hospital, and Millennium Pain Management. (Tr. 762-838.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

ambulance to St. John's Mercy Medical Center after having been
involved in an automobile accident whereby she was pinned in the
back seat of the affected vehicle with her left leg and foot
trapped. X-rays of the left knee and ankle, taken upon arrival at
the emergency department, were normal. X-rays of the right knee
were normal. Plaintiff's medical history was noted to include
arthritis in the knees—bilaterally, and plaintiff complained of
pain in both knees. Upon physical examination, plaintiff was
diagnosed with knee contusion and sprained ankle and was provided
crutches for ambulation. Plaintiff was discharged on September 27,
2003, and was restricted to bear weight on her left leg only as
tolerated and to lift no more than five to ten pounds until seen by
her doctor. Plaintiff was given a knee immobilizer and an air
cast. Plaintiff was given Percocet[2] upon discharge and was
instructed to return to Dr. David W. Irvine in one week for
evaluation. (Tr. 174-247.)

Plaintiff called Dr. Irvine's office on October 6, 2003,
requesting a refill of pain medication. Plaintiff was prescribed
Darvocet[3] for pain. (Tr. 253.)

On October 9, 2003, plaintiff visited Dr. Stanley A.

---

[2]Percocet is used to relieve moderate to severe pain. _Medline Plus_ (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[3]Darvocet is used to relieve mild to moderate pain. _Medline Plus_ (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

Sakabu for follow up. Plaintiff reported that she had been taking about six Percocet tablets a day and recently began taking her husband's Vicodin[4] inasmuch as she had run out of Percocet. Physical examination showed tenderness about a contusion on plaintiff's right knee. Plaintiff's left knee was not examined on account of a knee immobilizer. It was noted that plaintiff moved all four extremities well and, other than a slight limp with the use of the knee immobilizer, had a normal stride and gait. Dr. Sakabu noted plaintiff to continue to improve but that she required opiod analgesics for pain control. Plaintiff was prescribed Percocet and Bextra[5] for pain and was instructed to return in two weeks for follow up. (Tr. 249.)

On that same date, October 9, 2003, plaintiff visited Dr. Irvine for orthopedic follow up. Plaintiff reported that her left ankle and right knee had improved, but that she continued to have trouble with her left knee. Dr. Irvine noted plaintiff's left knee to be very tender in the medial joint line. Dr. Irvine questioned

---

[4]Vicodin is used to relieve moderate to severe pain. Medline Plus (last revised July 18, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

[5]Bextra is a non-steroidal anti-inflammatory drug (NSAID) used to reduce some symptoms caused by arthritis, such as pain, swelling and tenderness of joints. Medications & Drugs, MedicineNet.com available at <http://www.medicinenet.com/valdecoxib/article.htm> (last visited Aug. 7, 2012). Bextra has since been removed from the market due to potential cardiovascular side effects. Q & A on the FDA Actions for the Cox-2 Inhibitors & NSAIDs (Suspension of Sales & Mktg. of Bextra, MedicineNet.com available at <http:// www .medicinenet.com/script/main/art.asp?articlekey=46601>(last visited Aug. 7, 2012).

injury of the medial collateral ligament or meniscus.  An MRI of the knee was ordered.  (Tr. 253.)

Plaintiff returned to Dr. Irvine on October 15, 2003, who noted the MRI to show a tear of the anterior horn of the lateral meniscus.  Physical examination showed no effusion but some tenderness.  Upon review of the MRI and examination, Dr. Irvine diagnosed plaintiff with partial left anterior cruciate ligament tear with contusion.  Plaintiff was placed into a hinged knee brace and was instructed to begin range of motion and strengthening exercises.  Plaintiff was instructed to return in four weeks.  (Tr. 254, 255-56.)

Plaintiff visited Joy M. Carr at Turtle Creek Chiropractic on October 17, 2003, with complaints of intermittent lumbar pain and constant pain in both knees and left ankle.  Physical examination showed plaintiff to display extreme difficulty with her carriage and gait, with restricted movements.  Moderate tenderness was noted about both knees with palpation.  Severe tenderness was noted about the left ankle.  Cervical and lumbar x-rays were negative.  Plaintiff was diagnosed with low back pain, sacroiliac sprain/strain, swelling of legs, pain in legs, sprain/strain of knee, and sprain/strain of ankle.  A treatment plan was established for a series of chiropractic adjustments and rehabilitative exercises.  (Tr. 352-54.)

On October 22, 2003, plaintiff called Dr. Irvine's office and reported that the Tylenol-3 given to her did not relieve her

pain.  Dr. Irvine prescribed Vicodin for plaintiff.  (Tr. 254.)

From October 17 to October 30, 2003, plaintiff underwent treatment at Turtle Creek Chiropractic on ten occasions.  During her last treatment visit, plaintiff continued to complain of pain and discomfort in both knees and tenderness in the left ankle. (Tr. 355-57.)

Plaintiff returned to Dr. Irvine on November 5, 2003, and complained of having more pain in the right knee than in the left. No effusion was present.  No instability, locking or popping was noted.  Plaintiff also reported continued pain in the left ankle. Mild tenderness was noted about the right knee and left ankle.  Dr. Irvine diagnosed plaintiff with multiple contusions.  MRI's of the affected areas were ordered.  (Tr. 315.)

An MRI of the left ankle taken November 10, 2003, showed high grade near complete disruption of the flexor hallucis longus tendon.  Markedly attenuated distal fibers of the tendon were seen. A significant amount of fluid was noted around the torn tendon which was consistent with reactive edema.  (Tr. 323.)  An MRI of the right knee taken that same date showed multiple bone contusions and prominent joint effusion, with fluid superficial to the iliotibial band suggesting contusion with reactive fluid or possibly a small amount of hemorrhage.  (Tr. 322.)

On November 12, 2003, upon review of the MRI's and upon physical examination, Dr. Irvine diagnosed plaintiff with multiple contusions of the right knee and prescribed physical therapy.  A

- 9 -

Cam Walker was provided. Darvocet and Bextra were prescribed. (Tr. 153, 315.)

On November 14, 2003, plaintiff underwent physical therapy evaluation at St. Charles Sports and Physical Therapy. Aimee Calvin, MPT, completed the evaluation. Plaintiff complained of constant dull and throbbing pain in the right knee, with occasional sharp pain. Plaintiff reported the pain to increase with weight bearing activities and with climbing stairs. Plaintiff also reported that she had difficulty sleeping on account of the pain. Plaintiff complained of having constant sharp pain in her ankle, which increased with weight bearing activities and walking longer than an hour. Plaintiff reported using pain medications and ice for the pain. Upon evaluation of plaintiff's posture/balance, range of motion, and muscle tightness/weakness, Ms. Calvin developed a treatment plan and determined plaintiff's rehabilitation potential to be good. Plaintiff was scheduled for three therapy sessions a week for four weeks. (Tr. 155-56.)

From November 18 to December 9, 2003, plaintiff participated in six therapy sessions during which plaintiff complained of continued soreness and pain in her knees and ankle. It was noted that plaintiff became fatigued with some exercises but expressed a desire to return to all of her activities. (Tr. 157-58.)

On November 24 and December 8, 2003, plaintiff's prescription for Darvocet was refilled. (Tr. 314.)

Plaintiff returned to Dr. Irvine on December 10, 2003, and reported doing well in that her right knee and left ankle had improved. Plaintiff reported continued problems with her left knee in that she experienced pain and some instability. Mild tenderness of the left knee was noted upon examination. It was determined that plaintiff would undergo surgery on the knee. (Tr. 314.)

On December 16, 2003, plaintiff underwent diagnostic arthroscopy with partial lateral meniscectomy of the left knee. (Tr. 265-76.)

On December 20, 2003, plaintiff's prescription for Vicodin was refilled. (Tr. 314.)

During follow up on December 24, 2003, plaintiff reported to Dr. Irvine that she continued to have discomfort in the knee. Dr. Irvine noted the surgical site to be well healed. Plaintiff had full extension and flexion to 110 degrees, passively. No effusion was noted. Dr. Irvine prescribed physical therapy for active and passive range of motion and strengthening exercises. Plaintiff was instructed to participate in such therapy once a week for six weeks and to return to Dr. Irvine in four weeks for follow up. (Tr. 154, 285.)

On December 29, 2003, plaintiff underwent physical therapy evaluation during which plaintiff reported having intermittent, aching pain in her left knee with occasional sharp pain. On a scale of one to ten, plaintiff described the pain at a level eight with activity, with no pain at rest. Ms. Calvin noted

plaintiff to currently be working as a babysitter and described plaintiff as independent with all activities of daily living. Plaintiff's rehabilitation potential was noted to be good, and she was scheduled for a six-week course of therapy.  (Tr. 159-60.)

On January 2, 2004, plaintiff's prescription for Darvocet was refilled.  (Tr. 285.)

On January 20, 2004, Ms. Calvin reported that plaintiff had progressed fairly well in therapy during the previous three weeks but continued to complain of significant pain and continued to take pain medication.  It was noted that plaintiff reported continued difficulty with going up and down stairs.  It was noted that plaintiff's exercise sessions had been somewhat slow due to plaintiff's complaints of quick fatigue and minimal discomfort. Ms. Calvin recommended additional therapy sessions.  (Tr. 167.)

Plaintiff returned to Dr. Irvine on January 21, 2004, and complained of stiffness in both knees with pain radiating into the thigh and down the extremities.  Plaintiff reported that she had been attending her physical therapy sessions, and Dr. Irvine noted plaintiff's range of motion to have improved.  Physical examination showed no medial or joint line tenderness.  No effusion or crepitus was noted.  Dr. Irvine instructed plaintiff to continue with physical therapy and referred plaintiff to Dr. Sohn for her complaints of pain.  (Tr. 285.)

Plaintiff visited Dr. Daniel G. Sohn on February 3, 2004. Dr. Sohn noted plaintiff's current medications to be Darvocet and

Naprosyn.[6] Plaintiff complained of fatigue and recent weight gain due to inactivity. Plaintiff reported that pain in the lower extremities worsened with running, bending and with touching the knee areas. Plaintiff reported that sitting and applying ice and heat helped. Plaintiff reported having a lot of pain in the morning but that the pain decreases after her first few steps. Physical examination showed plaintiff's stance, gait and position changes to be normal. Range of motion about the back was normal. Strength in the lower extremities was normal with no significant discomfort with manual muscle testing. Straight leg raising was negative. No lower extremity edema was noted. Dr. Sohn noted tenderness to palpation over the bilateral iliotibial bands at the knees and in the left anserine bursa area. Dr. Sohn diagnosed plaintiff with bilateral knee pain and recommended more aggressive physical therapy work. (Tr. 283-84.) Dr. Sohn prescribed physical therapy three times a week for two weeks. (Tr. 154.)

On February 17, 2004, Bill Peroutka, MPT with St. Charles Sports and Physical Therapy, reported that plaintiff continued to complain of pain in her knee with running or using stairs and expressed uncertainty as to whether her condition was improving. It was noted that plaintiff reported minimal compliance with her

[6]Naprosyn (Naproxen) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, and pain from other causes. Medline Plus (last revised June 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

home exercise program. It was noted that plaintiff had made some progress with her objective goals but continued to have subjective complaints of pain. Mr. Peroutka opined that plaintiff would not benefit from continued physical therapy and recommended that plaintiff be discharged to a home exercise program. (Tr. 169.)

Plaintiff returned to Dr. Sohn on February 18, 2004, and reported that she felt a little stronger with physical therapy but continued to experience pain in the medial and lateral knees bilaterally. Plaintiff reported the pain to be more prominent with sitting and with activity and also when she first gets up in the morning. Physical examination showed plaintiff's stance, gait and position changes to be slow. Lower extremity strength was normal. No effusion was noted. Tenderness to palpation was noted over the anserine bursa areas and laterally over the iliotibial bands, bilaterally. Injections of Depo-Medrol[7] were administered. Plaintiff was instructed to continue with her workout activities and to return in two to three weeks for follow up. (Tr. 282.)

On March 4, 2004, plaintiff reported to Dr. Sohn that her pain was a lot better following the injections. Physical examination showed plaintiff's stance, gait and position changes to be normal. Range of motion of the back was normal with no pain. Lower extremity strength was normal with no pain. Moderate

_____

[7]Depo-Medrol is used to relieve inflammation. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html>.

tenderness was noted to palpation in both knees, but Dr. Sohn noted the tenderness to be "not as bad." Dr. Sohn diagnosed plaintiff with bilateral medial and lateral knee bursitis, but noted the condition to be much better following the injections. Plaintiff was instructed to continue with her exercises and stretches and to return for follow up as needed. (Tr. 281.)

On May 26, 2006, plaintiff underwent diagnostic left knee arthroscopy; synovectomy of medial, lateral and patella femoral compartments; and partial lateral meniscectomy in response to her complaints of increased pain, catching and locking of the left knee, as well as a diagnostic MRI which showed a tear of the lateral meniscus involving the anterior horn. Plaintiff's post-operative diagnoses were torn lateral meniscus of the left knee and synovitis. Plaintiff was discharged in stable condition. (Tr. 288-98.)

Plaintiff visited Dr. Sohn on July 27, 2006, with complaints of pain in the right hip. Plaintiff reported that an injection to the area did not help and that she did not attend recommended physical therapy because of the cost. It was noted that an x-ray of the hip was negative. Plaintiff reported the pain to flare up a day after horseback riding. Plaintiff reported her current medications to be Vicodin and Motrin. Physical examination showed plaintiff's stance, gait and position changes to be normal. Side bending to the left caused pain in the right iliac crest region, and tenderness to palpation was noted over the area. Lower

extremity strength was noted to be intact. Dr. Sohn diagnosed plaintiff with right iliac crest insertion strain. Because of plaintiff's disinterest in physical therapy, Dr. Sohn instructed plaintiff as to home exercise and prescribed Feldene[8] and Soma.[9] Plaintiff was instructed to follow up in three weeks. (Tr. 306-07.)

Plaintiff returned to Dr. Sohn on August 21, 2006, and complained of continued pain in the right lower back area. Plaintiff reported the pain to be at a level five or six. Plaintiff reported the home exercises to cause increased pain, but that she was able to do leg lifts and crunches without discomfort. Plaintiff reported the Feldene and Soma to make her sleepy and that she stopped taking Soma at night because she was too sleepy to get up and care for her child. Physical examination showed stance, gait and position changes to be normal. Flexion of the back caused pain along the right iliac crest. Tenderness to palpation was noted about the right lumbar paraspinals and SI joint. Lower extremity strength was intact, and no pain was elicited with manual muscle testing. Dr. Sohn diagnosed plaintiff with right low back

---

[8]Feldene is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last revised Jan. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html>.

[9]Soma, a muscle relaxant, is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html>.

pain and determined to order MRI's. Tramadol[10] and Skelaxin[11] were prescribed. (Tr. 305.)

On August 25, 2006, plaintiff called Dr. Sohn's office and reported an adverse reaction to Tramadol. Darvocet was prescribed. (Tr. 302.)

An MRI of the lumbar spine taken August 30, 2006, was unremarkable. (Tr. 319.) An MRI of the pelvis and right iliac crest showed a cyst in the area of the right adnexa. It was questioned whether an ovarian cyst may be the source of plaintiff's pain. (Tr. 318.)

On September 6, 2006, Dr. Sohn administered a trigger point injection in response to plaintiff's continued complaints of pain in the right iliac crest area. Dr. Sohn diagnosed plaintiff with right gluteal myofascial pain and instructed plaintiff to return in two to three weeks. (Tr. 304.)

Plaintiff returned to Dr. Sohn on September 25, 2006, and reported that her right lower back pain was much better and that the trigger point injection helped immediately. Plaintiff currently complained of pain in her right elbow. Upon physical

---

[10]Tramadol is used to relieve moderate to moderately severe pain. Medline Plus (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[11]Skelaxin, a muscle relaxant, is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html>.

examination, Dr. Sohn diagnosed plaintiff with right lower back pain due to iliac crest muscle insertion strain and right lateral epicondylitis. Dr. Sohn provided home exercises for plaintiff to perform for both conditions. An injection was also administered for the epicondylitis. Plaintiff was instructed to return as needed. (Tr. 303.)

Plaintiff visited Dr. Matthew J. Matava on October 19, 2006, with complaints of recurrent pain in the left knee which she began to experience in March 2006. Plaintiff complained of having diffuse knee pain, intermittent locking, popping, pain with stairs, and pain with sitting since that time. Plaintiff reported taking Darvocet but with little relief. Physical examination showed plaintiff to walk with a normal gait. Diffuse tenderness was noted about the knee. X-rays obtained of the left knee showed no joint space narrowing. Additional x-rays showed plaintiff's right leg to be 0.75 centimeter longer than the left, with evidence of narrowing of the medial joint space compartment in the right knee. Dr. Matava diagnosed plaintiff with left knee pain, unknown etiology, and determined to order an MRI arthrogram to evaluate the condition of the meniscus. (Tr. 330-31, 327.)

On November 1, 2006, plaintiff underwent an MRI arthrogram of the left knee which showed severe lateral compartment chondrosis and mild medial compartment chondrosis. It was also noted that the entire anterior horn and majority of the body of the lateral meniscus were absent. (Tr. 325-26.) An x-ray of the left

knee taken on November 8, 2006, showed small marginal spurs and minimal narrowing of the joint spaces. (Tr. 395.) In view of the MRI and other testing, Dr. Matava determined that plaintiff would be eligible for a lateral meniscal allograft. (Tr. 332.)

On November 27, 2006, plaintiff's prescription for Darvocet was refilled. (Tr. 335.)

On December 29, 2006, plaintiff underwent arthroscopic lateral meniscal allograft transplantation and arthroscopic chondroplasty involving the left knee. (Tr. 408-09.)

During plaintiff's post-operative visit on January 4, 2007, she had no complaints. Dr. Matava noted plaintiff to be doing well. X-rays of the knee showed the bone bridge to be in good position. Dr. Matava instructed plaintiff to begin physical therapy and to be non-weight bearing for two weeks. (Tr. 400.)

On January 17, 2007, SSM Rehab reported to Dr. Matava that, after three visits to physical therapy, plaintiff was responding poorly in that she had significant range of motion issues and edema that had not subsided. (Tr. 613.)

Plaintiff returned to Dr. Matava on January 18, 2007, with complaints of stiffness and pain. It was noted that plaintiff had not been attending physical therapy. Attendance at physical therapy was stressed given its importance in preventing a permanently stiff joint. Vicodin was prescribed and plaintiff was instructed to return in four weeks. (Tr. 631-32.)

On February 12, 2007, Dr. Matava noted plaintiff to

continue to have issues with knee flexion.  Dr. Matava recommended that plaintiff use a Flexionator while on vacation in New Orleans during the following ten to fourteen days.  (Tr. 629-30.)  On that same date, plaintiff reported to SSM Rehab that she continued to experience pain, stiffness and soreness in her left knee. Plaintiff reported that the pain increased with movement and after activity.  It was noted that plaintiff struggled with range of motion.  Plaintiff's strength was noted to be improving.  It was recommended that plaintiff continue with therapy.  (Tr. 403.)

Plaintiff visited Dr. Matava on March 1, 2007, who noted plaintiff to have made minimal gains with therapy.  Arthroscopic debridement with manipulation was recommended.  (Tr. 627-28.)

On March 9, 2007, it was noted that plaintiff continued to have decreased range of motion despite therapy.  Plaintiff underwent left knee arthroscopic debridement and manipulation that same date at Barnes-Jewish Hospital.  Plaintiff was discharged on March 11, 2007, in stable condition.  Upon discharge, plaintiff was instructed to engage in weight bearing activities as tolerated and to begin physical therapy.  (Tr. 475-537.)

On March 23, 2007, SSM Rehab reported to Dr. Matava that plaintiff was unable to attend therapy on a daily basis for a variety of personal reasons, but that plaintiff had a fair response to therapy.  (Tr. 614.)

Plaintiff returned to Dr. Matava on March 26, 2007, who noted plaintiff to walk with a slight limp.  Plaintiff was

instructed to continue with therapy, and Vicodin was prescribed. (Tr. 625-26.)

On April 20, 2007, SSM Rehab reported that plaintiff had shown improvement with therapy. It was noted that plaintiff reported her pain to be at a level nine without pain medication, and at a level two with pain medication. (Tr. 615.)

Dr. Matava administered a corticosteroid injection on April 23, 2007, to help with discomfort related to plaintiff's rehabilitation. It was noted that plaintiff was also taking Darvocet. No effusion or tenderness was noted about the knee. (Tr. 623-24.)

On April 26, 2007, plaintiff reported to SSM Rehab that she had participated in some bowling activity. Plaintiff reported her pain to be at a level four or five. (Tr. 603.) On April 30, 2007, plaintiff reported to SSM Rehab that she had been busy with trimming bushes, washing her car, going to Wal-Mart, and doing laundry. Plaintiff's pain was noted to be at a level two. (Tr. 604.) On May 10, 2007, plaintiff reported to SSM Rehab that she continued to awaken with pain and had difficulty sleeping. Plaintiff reported her pain to be at a level seven. (Tr. 606.)

On May 31, 2007, plaintiff visited Dr. Chad Shelton, a pain specialist at Pain Management Services, with complaints of pain in the left knee having a duration of five months. Plaintiff reported the pain to have improved since her most recent surgery. Plaintiff rated her pain as ranging between level two and level

eight on a scale of one to ten, with level five being the overall average level of pain. Plaintiff described the pain as shooting, throbbing, aching, and sharp, and that she experienced the pain mostly in the morning. Plaintiff reported that she experienced weakness with the pain and that the pain was exacerbated by exercise, walking, standing, driving, moving from sitting to standing, and taking the stairs. Plaintiff reported that lying down and medication helped to relieve the pain. As to her exertional abilities, plaintiff reported that she can lift light to medium weights if they are positioned on a table; can walk no more than one-quarter mile; can sit in any chair indefinitely; can stand no more than ten minutes; gets less than six hours sleep; and can take journeys over two hours in duration. Physical examination was unremarkable. Plaintiff had full muscle strength of the lower extremities and no effusion or allodynia of the knee. Dr. Shelton diagnosed plaintiff with degenerative knee pain and prescribed Lidoderm patch.[12] Plaintiff was instructed to continue with Darvocet and physical therapy. (Tr. 677-80.)

Plaintiff visited Dr. Matava on June 4, 2007, and reported having diffuse discomfort in the knee. It was noted that plaintiff was able to bowl. Plaintiff reported that she was seeing a pain specialist who had prescribed Lidoderm patches and Darvocet.

---

[12]Lidoderm patches are used to relieve the pain of post-herpetic neuralgia. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html>.

Physical examination showed plaintiff to walk with a normal gait and to have no effusion about the knee. Diffuse tenderness was noted to palpation from the distal thigh to the proximal leg. Ligamentous exam was intact. Passive range of motion was 0-130 degrees of flexion. Dr. Matava diagnosed plaintiff with status post lateral meniscal allograft transplantation, and left knee pain out of proportion to injury with questionable etiology. Dr. Matava opined that there was no indication for further surgery inasmuch as the tenderness was in a location unrelated to the transplant. Plaintiff was encouraged to continue with her pain specialist. (Tr. 621-22.)

Plaintiff returned to Dr. Shelton on June 13, 2007, and complained of mild left knee pain. Plaintiff reported receiving seventy-five percent pain relief with medication, and that such medication "made things a little better." It was noted that Lidoderm patches and Darvocet helped plaintiff significantly. Physical examination was unremarkable. Dr. Shelton determined to continue plaintiff on her current treatment regimen given her report of "good relief." Plaintiff was instructed to decrease her dosage of Darvocet. (Tr. 681-82.)

On June 18, 2007, plaintiff underwent evaluation at SSM Rehab upon the referral of Dr. Shelton for the condition of degenerative knee. (Tr. 567.)

Plaintiff visited Dr. Michael S. Boedefeld of Pain Management Services on July 12, 2007, and complained of having

moderate left knee pain. Plaintiff reported getting sixty percent relief from her medications. Dr. Boedefeld noted plaintiff to walk with a mildly antalgic gait. Plaintiff had full range of motion but some tenderness. Dr. Boedefeld diagnosed plaintiff with knee pain and instructed plaintiff to continue with her medications and with exercise. (Tr. 683-84.)

In a report to Dr. Shelton dated August 1, 2007, SSM Rehab stated that plaintiff had a fair response to therapy and that plaintiff continued with pain and loss of range of motion as demonstrated by a lag in her gait and with activities of daily living. It was noted that plaintiff was awaiting the receipt of a brace. It was recommended that plaintiff continue with therapy. (Tr. 568.)

Plaintiff visited Dr. Shelton on August 7, 2007, and complained of mild left knee pain. Physical examination showed some tenderness about the left knee with full muscle strength of all extremities. Dr. Shelton determined to continue plaintiff on her current treatment regimen, including physical therapy. (Tr. 685-87.)

On September 7, 2007, plaintiff reported to Dr. Shelton that she experienced moderate left knee pain. Dr. Shelton noted plaintiff's current medications to include Darvocet, Lidoderm patch and Naproxen. Plaintiff reported that she obtained "near complete relief" from her medications. Physical examination showed plaintiff to have limited extension of the left knee and some

tenderness.  Dr. Shelton opined that plaintiff's knee was stable overall.  Plaintiff had full muscle strength in all extremities. Dr. Shelton continued in his diagnosis of degenerative left knee pain and instructed plaintiff to continue with her current treatment.  (Tr. 688-89.)

In a report dated September 20, 2007, SSM Rehab reported that plaintiff continued with severe pain and had difficulty with full extension of the knee and with kneeling.  Plaintiff was able to bend her knee better.  It was noted that plaintiff was using her brace to help with straightening the knee.  (Tr. 549.)

Plaintiff was discharged from SSM Rehab on October 30, 2007, having had a fair response to physical therapy.  It was noted that plaintiff had met her goals for home exercise and passive range of motion with extension, but that she did not meet her goals with respect to pain and active extension.  It was noted that plaintiff reported having more significant buttock pain than knee pain, but suggested that such may be because she was no longer taking Vicodin.  (Tr. 551.)

On October 31, 2007, plaintiff visited Dr. Shelton and complained of moderate to severe pain in her left knee and right hip.  Plaintiff reported that she obtained "near complete relief" from her medications and that she experienced worsening pain after decreasing her Darvocet.  Physical examination showed nearly full extension of the left knee with pain, and limited flexion. Plaintiff's knee was noted to be stable.  Plaintiff's dosage of

Darvocet was increased, and Relafen[13] was prescribed in place of Naproxen. (Tr. 690-92.)

Plaintiff returned to Dr. Shelton on November 26, 2007, and complained of moderate left knee and right hip pain. Plaintiff's knee was noted to be stable but had limited flexion and extension. Dr. Shelton diagnosed plaintiff with degenerative arthritis of the knee and myofascial pain. Plaintiff was instructed to continue with her current treatment inasmuch as she obtained good relief therefrom. (Tr. 693-94.)

Plaintiff visited Dr. Matava on January 7, 2008, with complaints of pain more severe than before her December 2006 surgery. Plaintiff reported that she could not kneel or climb stairs and that her medications included Darvocet, muscle relaxants and Lidoderm patches as prescribed by a pain specialist. Plaintiff also complained of pain in her right hip. Physical examination showed no warmth, erythema or effusion of the left knee. No point tenderness was noted. No crepitus was noted on active extension. Passive range of motion with flexion of the knee was from fifteen to 130 degrees. Ligamentous examination was intact. Examination of the right hip showed full, non-tender passive range of motion. Plaintiff exhibited no pain with axial loading. Plaintiff had full motor strength with hip abduction, adduction, flexion, and

_____

[13]Relafen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692022.html>.

- 26 -

extension. Dr. Matava diagnosed plaintiff with status post lateral meniscal allograft transplantation of the left knee, and right hip pain possibly related to left knee compensation. Dr. Matava recommended referral to a physiatrist for evaluation of the right hip. The possibility of extension casting or arthroscopic debridement of the left knee was discussed, but Dr. Matava noted plaintiff to be adamantly against any such form of intervention. Plaintiff was instructed to return as needed. (Tr. 619-20.)

Plaintiff returned to Dr. Shelton on January 22, 2008, and complained of constant moderate pain. Plaintiff reported that she obtained near complete relief from her pain medications in that she obtained eighty to ninety percent relief. Plaintiff reported the Darvocet to help her knee and with exercising, but that trigger point injections did not help her hip pain. Physical examination showed tenderness above the right iliac crest with rotation. Plaintiff had near full extension of the left knee with pain. Dr. Shelton continued in his diagnoses of plaintiff and added Zanaflex[14] to her medication regimen for myofascial pain. (Tr. 695-96.)

Plaintiff visited Dr. Shelton on March 21, 2008, and reported obtaining ninety percent relief with her pain medications. Plaintiff also reported that she had improved sleep with Zanaflex

---

[14]Zanaflex (Tizanidine) is used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury. Medline Plus (last revised Feb. 11, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html>.

but noted sedation.  Physical examination showed crepitation about the left knee.  Dr. Shelton continued in his diagnoses and treatment of plaintiff and reduced plaintiff's dosage of Zanaflex. (Tr. 698-99.)

Plaintiff returned to Dr. Shelton on May 15, 2008, and reported no changes.  Dr. Shelton noted there to be swelling, redness and warmth about the left knee, and mild tenderness over the iliac crest on the left.  Dr. Shelton continued in his diagnoses and treatment regimen and instructed plaintiff to follow up with Dr. Matava for possible surgery.  (Tr. 706-07.)

On July 11, 2008, plaintiff reported to Dr. Boedefeld that she experienced constant, moderate pain about the left knee and right hip.  Plaintiff reported obtaining ninety percent relief with pain medications.  Tenderness to palpation was noted about the left knee.  Plaintiff was instructed to continue with her current treatment regimen and to return in two months to see Dr. Shelton. (Tr. 708-09.)

On July 25, 2008, Allison Egley, a single decision-maker with disability determinations, completed a residual functional capacity assessment in which she opined that plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk a total of at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and had unlimited ability to push and/or pull, including with hand/foot controls.  Ms. Egley further opined that

plaintiff could frequently balance and climb ramps and stairs; occasionally stoop, kneel, crouch, crawl; and occasionally climb ladders, ropes and scaffolds. Ms. Egley opined that plaintiff had no manipulative, visual or communicative limitations. Ms. Egley further opined that plaintiff should avoid concentrated exposure to hazards, but otherwise had no environmental limitations. (Tr. 710-15.)

Plaintiff returned to Dr. Shelton on September 12, 2008, and continued in her report of left knee and right hip pain with near complete relief from pain medications. Plaintiff reported her left knee to be bothersome and stated that she was considering further surgery. Physical examination showed plaintiff unable to fully extend her left knee. Tenderness to palpation was noted over the left knee and over the iliac crest. Dr. Shelton continued in his diagnoses of degenerative joint disease and myofascial pain and instructed plaintiff to continue with her current treatment regimen. Dr. Shelton referred plaintiff to a podiatrist for possible shoe inserts to resolve leg length discrepancy. (Tr. 736-37.)

On November 11, 2008, plaintiff reported to Dr. Shelton that she obtained significant improvement in her symptoms with medications. Physical examination showed some tenderness over the iliac crest area but was otherwise unremarkable. Dr. Shelton continued plaintiff on her current regimen and prescribed Flector

patches.[15]  (Tr. 739-41.)

On January 13, 2009, plaintiff reported to Dr. Shelton that she continued to have a fair amount of pain but that she obtained good relief and improved function with her medications. Examination showed some pain and tenderness over the right iliac area.  Plaintiff was instructed to continue with her current medications.  (Tr. 742-44.)

Plaintiff returned to Dr. Shelton on March 6, 2009, and reported that she had recently been diagnosed with psoriatic arthritis for which she was prescribed Celebrex[16] which provided some help with the swelling in her joints.  Physical examination showed some pain to palpation about the left knee but was otherwise unremarkable.  Dr. Shelton diagnosed plaintiff with myofascial pain, degenerative knee pain and possible rheumatoid arthritis or psoriatic arthritis.  Plaintiff was continued on her current medication regimen, including Celebrex.  (Tr. 745-46.)

Plaintiff visited Dr. Pierre J. Moeser on April 1, 2009, with complaints of chronic pain in the left knee and right hip; and with additional complaints of experiencing pain in the elbows,

---

[15]Flector patches are used to treat short-term pain due to minor strains, sprains and bruises.  Medline Plus (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a611001.html>.

[16]Celebrex is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis.  Medline Plus (last reviewed Sept. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

wrists, ankles, fingers, and toes. Plaintiff reported this additional pain to have begun two months prior and that such pain was persistent and achy. Plaintiff further reported this pain to be different from the pain experienced after her accident and surgeries. Plaintiff reported the pain to be aggravated by rest, reaching, gripping, standing, walking, rising from a chair, and weather. Plaintiff reported that her primary physician prescribed Celebrex which helped her condition. Physical examination showed plaintiff's fingernails to be moderately dystrophic. Psoriatic lesions were noted about the back and extremities. Plaintiff exhibited pain in both elbows. Plaintiff's hands and feet were noted to have swelling, bilaterally. Plaintiff had full range of motion about the right hip. Crepitus was noted about the left knee. Dr. Moeser noted plaintiff's current medications to be Darvocet, Naproxen and Plaquenil.[17] Dr. Moeser diagnosed plaintiff with moderate psoriatic arthropathy and severe osteoarthritis of the left leg. (Tr. 723-26.)

Plaintiff returned to Dr. Moeser on May 4, 2009, and reported improvement in her psoriatic arthritis. Plaintiff reported having no back pain, joint pain or morning stiffness. Physical examination was unremarkable with no tenderness or limited

---

[17]Plaquenil is used to treat discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601240.html>.

range of motion about any joint, including bilateral hands, feet, elbows, hips, and knees. Plaintiff was prescribed Prednisone,[18] Naproxen, Plaquenil, and Darvocet. Given the improvement in plaintiff's condition, Dr. Moeser determined not to prescribe additional medication. (Tr. 727-29.)

X-rays of the hands taken May 4, 2009, showed mild degenerative narrowing of the second through fifth proximal and distal interphalangeal joints. An x-ray of the chest showed prominent interstitial markings within the left and right peri and infrahilar region. (Tr. 733-35.)

Plaintiff visited Dr. Shelton on May 5, 2009, and reported good relief with her pain medications. Physical examination showed mild crepitus in the left knee with some diffuse tenderness. Tenderness was noted about the iliac crest on the right. Plaintiff had full muscle strength in all extremities. Plaintiff was continued on her current medication regimen. (Tr. 747-48.)

Plaintiff returned to Dr. Shelton on July 7, 2009, and reported no significant changes. Plaintiff reported some diffuse arthralgias but reported that her medication gave her some relief. Tenderness was noted over the iliac crest area with significant pain upon palpation. Diffuse tenderness and mild crepitus was

---

[18]Prednisone is used to treat certain types of arthritis. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html>.

noted about the left knee. Dr. Shelton continued plaintiff on her current treatment regimen. (Tr. 749-50.)

Plaintiff visited Dr. Moeser on September 3, 2009, and reported having achy and dull pain in her right shoulder and bilateral hands and feet which was worsening. Plaintiff reported that nothing relieved the pain. Plaintiff also reported continued pain in her left knee which was relieved with rest. Plaintiff's medications were noted to include Plaquenil, Gabapentin,[19] Darvocet, and Tizanidine. Physical examination showed tenderness about the feet bilaterally and swelling about the hands bilaterally. Examination of the left knee and right hip was unremarkable. Plaintiff had full mobility about the back and full range of motion about the hips, knees and elbows, bilaterally. Plaintiff had full range of motion about the left shoulder, with pain noted about the right shoulder. Plaintiff was diagnosed with severe psoriatic arthropathy and severe osteoarthritis of the left leg. (Tr. 752-54.)

On October 7, 2009, Dr. Moeser completed an Arthritis Residual Functional Capacity Questionnaire in which he reported plaintiff's diagnoses to be psoriatic arthritis and post-traumatic knee arthritis. Dr. Moeser noted that he had treated plaintiff on three occasions in April, May and September 2009. Dr. Moeser

---

[19]Gabapentin (Neurontin) is used to relieve the pain of postherpetic neuralgia. Medline Plus (last revised July 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

- 33 -

reported that plaintiff's symptoms of the conditions included pain, swelling and stiffness. Dr. Moeser reported that plaintiff experienced moderate to severe pain on a daily basis in the areas of her knee, shoulder, hand, and foot. Dr. Moeser noted plaintiff's pain to worsen with gripping, standing, walking, rising from a chair, climbing stairs, and inclement weather. Dr. Moeser noted objective signs of plaintiff's conditions to include joint warmth, reduced grip strength, sensory changes, tenderness, crepitus, swelling, and muscle weakness. Dr. Moeser opined that plaintiff's pain constantly interfered with her attention and concentration. Dr. Moeser noted plaintiff not to have any psychological conditions affecting her perception of pain. Dr. Moeser opined that plaintiff could not tolerate even low stress jobs, reporting that plaintiff was "in unrelenting pain. Other medical conditions have excluded certain treatments. Current treatment is not controlling pain, stiffness, swelling." (Tr. 757.) Dr. Moeser reported that plaintiff experienced side effects from her medications, including dizziness, drowsiness, fatigue, and stomach upset. Dr. Moeser opined that plaintiff could not walk the length of a city block. Dr. Moeser opined that plaintiff could sit for twenty minutes at a time, stand for fifteen minutes at a time, could stand or walk for a total of less than two hours in an eight-hour workday, and sit for a total of about two hours in an eight-hour workday. Dr. Moeser opined that plaintiff would need periods of walking throughout the workday, about every fifteen to twenty

minutes, for a period of five minutes each. Dr. Moeser opined that plaintiff would need to be able to sit, stand and walk at will at a job. Dr. Moeser opined that plaintiff would need to take an unscheduled work break every fifteen to twenty minutes, with each break lasting ten to twenty minutes. Dr. Moeser opined that plaintiff would have to sit quietly during her breaks. Dr. Moeser opined that plaintiff would have to elevate her legs while sitting at work. Dr. Moeser reported that plaintiff does not require the use of an assistive device for walking. Dr. Moeser opined that plaintiff could rarely lift and carry less than ten pounds, and could never lift and carry in excess of that weight. Dr. Moeser further opined that plaintiff could rarely twist, stoop or bend; and could never crouch, climb ladders or climb stairs. Dr. Moeser opined that plaintiff had significant limitations in repetitive reaching, handling or fingering, and could engage in no gross or fine manipulation of the hands during a workday. Dr. Moeser opined that plaintiff could engage in reaching with her arms during ten percent of a workday. Dr. Moeser reported that plaintiff's condition would likely produce "good" days and "bad" days, and that plaintiff would likely be absent from work more than four days a month on account of her impairments or treatment therefor. Finally, Dr. Moeser reported that plaintiff would need to avoid temperature extremes, humidity, hazards, and machinery. (Tr. 755–61.)

X-rays taken on February 2, 2010, showed no evidence suggestive of sacroilitis about the sacroiliac joints. Straightening of the cervical spine was noted as well as degenerative disc disease at the C5-6 level with greater narrowing of the right neural foramen. Mild rotatory scoliosis of the lumbar spine was noted with concavity to the right. Mild focal scoliosis of the thoracic spine centered at T8 was also noted with concavity to the right. (Tr. 763-64.)

Plaintiff visited Nurse Practitioner Christopher R. Hemmer at Piper Spine Care on February 19, 2010, for evaluation of neck pain and low back pain. Plaintiff's history of rheumatoid arthritis was noted for which she received Enbrel[20] injections on a weekly basis. It was noted that plaintiff was taking Darvocet for pain but continued to experience achiness about the neck with headaches and shoulder discomfort. Physical examination showed grips, interossei and wrist extensors to be unremarkable. Push/pull maneuvers were noted to be strong and intact. Plaintiff's reflexes at the biceps, triceps and brachioradialis were +2. Plaintiff had limited range of motion about the cervical spine. Axial load was noted to reproduce a lot of neck pain. NP Hemmer noted x-rays to show moderately advanced degenerative disc

---

[20]Enbrel injections are used to relieve the symptoms of certain autoimmune disorders including rheumatoid arthritis and psoriatic arthritis. Medline Plus (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602013.html>.

disease at the C5-6 level with anterior osteophyte formation.  The lumbar spine was noted to have some early degenerative changes at L5-1.  An MRI was ordered of the cervical spine.  It was noted that plaintiff requested that she see another pain specialist due to conflicts with her previous physician.  (Tr. 795.)

Plaintiff visited Dr. Steven J. Granberg, a pain management specialist, on February 25, 2010, for evaluation of chronic pain syndrome.  It was noted that plaintiff's previous treatment for pain management was primarily a medication regimen and did not provide significant relief.  Dr. Granberg noted plaintiff to have chronic spine pain attributed to rheumatoid arthritis.  Plaintiff's current complaint was of pain in her neck with radiation to the upper extremities.  It was noted that plaintiff had MRI examinations scheduled for the following week. Plaintiff reported that she had been taking Neurontin as prescribed by Dr. Shelton and had taken Vicodin in the past.  Plaintiff also reported that Dr. Moeser had administered Enbrel injections.  Dr. Granberg determined to develop a treatment plan upon reviewing the results of plaintiff's upcoming MRI exams and records from Drs. Shelton and Moeser.  (Tr. 765.)

Plaintiff visited NP Hemmer on March 11, 2010, who ordered selective injections to the C6 bilaterally.  (Tr. 794.)

Plaintiff returned to Dr. Granberg on March 18, 2010, and continued to complain of moderate pain in the neck, both shoulders and down the back.  Plaintiff reported that she experienced the

pain constantly. Plaintiff reported that prescribed medication provided partial pain relief — approximately fifty percent — and that she felt a little better with medication. Dr. Granberg noted the MRI of the cervical spine to show degenerative changes at the C5-C6 level resulting in central stenosis and bilateral neuroforaminal narrowing. Review of systems was unremarkable. Dr. Granberg diagnosed plaintiff with cervicalgia, cervical radicular pain, history of rheumatoid arthritis, lumbalgia, and bilateral knee degenerative joint disease. It was determined that plaintiff would undergo selective nerve root injections at the C-6 level, bilaterally. Plaintiff was instructed to continue with Vicodin. Cervical epidural steroid injections were administered that same date. (Tr. 767-71.)

Plaintiff visited NP Hemmer on April 8, 2010, who noted that conservative care did not seem to significantly help plaintiff's condition. NP Hemmer noted the MRI to indicate single level disease at C5-6 with disc osteophyte complex. Plaintiff reported intermittent bilateral upper extremity numbness and tingling. Plaintiff reported that she was "tired of living like this" and did not want to continue with medications or injections. NP Hemmer determined to continue with conservative therapy and instructed plaintiff to return in three to four weeks at which time they would consult with Dr. Piper. Plaintiff was referred for physical therapy, with such therapy to include ultra sound, electrical stimulation and traction. (Tr. 792, 793.)

Plaintiff returned to NP Hemmer on May 3, 2010, who noted plaintiff's medical history of rheumatoid arthritis and chronic hip and knee pain. Plaintiff's current medications were noted to include Vicodin, Neurontin, Zanaflex, and Enbrel injections. Plaintiff was diagnosed with rheumatoid arthritis and degenerative disc disease at C5-C6. (Tr. 777.) Plaintiff was provided an Aspen collar. (Tr. 779.)

Plaintiff returned to NP Hemmer on May 4, 2010, and reported that her at-home exercises did not help and that she currently had bilateral scapular pain. It was noted that the injections helped significantly with her arm pain but that plaintiff continued to have neck problems. It was also noted that plaintiff had immuno suppression issues with her rheumatoid arthritis and Enbrel injections. (Tr. 791.)

Plaintiff was admitted to St. Joseph Hospital West on May 19, 2010, to undergo complete anterior cervical discectomy at the C5-6 level. It was noted that plaintiff had degenerative disc disease at the C5-6 level and chronic left arm pain with complete, but temporary, relief after left C6 nerve root injection. Plaintiff had significant improvement in her arm symptoms post-operatively and was discharged on May 20, 2010. Plaintiff was instructed to engage in activities as tolerated with a cervical collar. Plaintiff was specifically instructed not to engage in

heavy lifting, pushing or pulling.  Plaintiff was prescribed Norco[21]
and Zanaflex upon discharge.  (Tr. 780-84, 805-15.)

Plaintiff returned to NP Hemmer on July 6, 2010, for
follow up of her recent surgery.  It was noted that plaintiff was
a slow healer and had a history of being a slow healer.  Plaintiff
was noted to be neurologically intact with no weakness.  X-rays did
not show much progression with bone incorporation.  NP Hemmer noted
that he would look into getting a bone stimulator for plaintiff.
It was determined that plaintiff would follow up with Dr. Granberg
for medication management given the chronic nature of plaintiff's
condition.  It was also noted that plaintiff had a "plethora of
polyarthralgia complaints associated with her concomitant
[rheumatoid arthritis]."  (Tr. 789.)  Plaintiff was prescribed
Norco for pain.  (Id.)

### IV.  The ALJ's Decision

The ALJ found that plaintiff last met the insured status
requirements of the Social Security Act on December 31, 2008, and
had not engaged in substantial gainful activity since the alleged
onset date of disability, September 26, 2003.  The ALJ determined
that plaintiff's "residual knee pain after motor vehicle accident"
constituted a severe impairment, but that plaintiff did not have an
impairment or combination of impairments that met or medically

---

[21]Norco is used to relieve moderate to severe pain.  Medline
Plus (last revised July 18, 2011)<http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a601006.html>.

equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, App'x 1. The ALJ found that, through the date she was last insured, plaintiff had the RFC to perform the full range of sedentary work and could perform her past relevant work as a receptionist. The ALJ therefore found plaintiff not to be under a disability at any time from September 26, 2003, to the date last insured, December 31, 2008. (Tr. 11-19.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Here, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred at Step 2 of the sequential analysis by failing to adequately consider and/or discuss plaintiff's psoriatic arthritis and hip and back pain. Plaintiff also contends that the ALJ erred by failing to consider the opinion of plaintiff's treating physician, Dr. Moeser, and by failing to specify the weight accorded to the opinion of the State agency decision-maker. Plaintiff further argues that the ALJ's RFC determination is not supported by the medical evidence of record, and that the ALJ erred by failing to include plaintiff's restricted use of her hands in the RFC determination. Finally, plaintiff

claims that the ALJ's findings regarding the medical evidence of record are incomplete.  The undersigned will consider each of plaintiff's contentions in turn.

A.    Step 2 - Severe Impairments

At Step 2 of the sequential evaluation, the ALJ decides whether a claimant has a severe impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.

At Step 2 of the sequential evaluation in this cause, the ALJ determined plaintiff's "residual knee pain after motor vehicle accident" to constitute a severe impairment.  (Tr. 13.)  Without further discussion as to any other alleged impairment, the ALJ then continued on in the five-step evaluation.  Plaintiff contends that the ALJ failed to adequately consider all of plaintiff's impairments at Step 2, and specifically, plaintiff's psoriatic arthritis as evidenced by pain and swelling in the hands and feet, and back and hip pain.  For the reasons set out below, any error in this regard was harmless.

As an initial matter, the undersigned notes that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2008.  As such, to qualify for Disability Insurance Benefits, plaintiff must demonstrate that she was disabled on or before December 31, 2008.  Trossauer v. Chater, 121 F.3d 341, 342 (8th Cir. 1997).  Assuming *arguendo* that

plaintiff's psoriatic arthritis and back and hip pain constituted severe impairments on the date last insured, the ALJ's failure to so find arises to nothing more than harmless error. The ALJ here found plaintiff to suffer another severe impairment, residual knee pain. As such, he was required to consider any non-severe impairments when determining plaintiff's RFC. 20 C.F.R. § 404.1545(a)(2).

A review of the ALJ's decision *in toto* shows that, subsequent to his analysis at Step 2, the ALJ considered and discussed plaintiff's complaints and symptoms related to psoriatic arthritis, pain and swelling, and back and hip pain. Indeed, the ALJ specifically discussed these conditions and the treatment rendered therefor in determining plaintiff's RFC. (Tr. 15, 17-18.) Given the ALJ's inclusion of these impairments in his subsequent analysis, the failure to include them at Step 2 was harmless. See Maziarz v. Secretary of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987); Lorence v. Astrue, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); see also Chavez v. Astrue, 699 F. Supp. 2d 1125, 1133 (C.D. Cal. 2009).

Accordingly, plaintiff's claim that the Commissioner's decision should be reversed on account of the ALJ's failure to consider plaintiff's psoriatic arthritis and back and hip pain at Step 2 of the sequential analysis should be denied.

B.   Opinion Evidence

        In evaluating opinion evidence, the Regulations require
the ALJ to explain in the decision the weight given to any opinions
from treating sources, non-treating sources and non-examining
sources.   See 20 C.F.R. § 404.1527(f)(2)(ii).   Plaintiff claims
that the ALJ erred in the instant cause inasmuch as he wholly
failed to address the October 2009 opinion rendered by plaintiff's
treating source, Dr. Moeser; and failed to specify the weight given
to the Social Security Administration's single decision-maker,
Allison Egley.   For the following reasons, the ALJ did not err in
his decision.

        1.   *Dr. Moeser*

        In his written decision, the ALJ summarized plaintiff's
complaints made to and the treatment rendered by Dr. Moeser in May
and September 2009.   Although Dr. Moeser completed an RFC
assessment in October 2009, the ALJ did not address this assessment
in his decision.   Plaintiff claims that the ALJ's failure to
address this opinion evidence from plaintiff's treating physician
was error.

        The record shows that Dr. Moeser first saw plaintiff in
April 2009 for what was described as chronic leg pain as well as
pain in the elbows, wrists, ankles, fingers, and toes which had
begun two months prior.   In May 2009, Dr. Moeser noted plaintiff's
condition of pain and swelling to have improved with medication,
and indeed plaintiff had no complaints and physical examination was

unremarkable.  In September 2009, plaintiff reported to Dr. Moeser that she experienced worsening pain, and swelling was observed. Plaintiff notably had full range of motion about the affected areas.  In his October 2009 RFC assessment, Dr. Moeser provided his opinion as to plaintiff's current functional abilities related to her diagnosed conditions of psoriatic arthritis and post-traumatic arthritis of the knee.  No retrospective analysis was provided.

Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2008.  As such, to qualify for Disability Insurance Benefits, plaintiff must demonstrate that she was disabled on or before December 31, 2008.  <u>Trossauer</u>, 121 F.3d at 342.  "[W]e will only consider an individual's medical condition as of the date she was last insured."  <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997).  In order for a progressive disease to support an award of disability benefits, "[the] disease must have progressed from latency to a level constituting severe impairment as defined under Title II before the expiration of the insured period."  <u>List v. Apfel</u>, 169 F.3d 1148, 1149 (8th Cir. 1999) (citing <u>McClain v. Bowen</u>, 848 F.2d 892, 894 (8th Cir. 1988)).

Dr. Moeser was not plaintiff's physician, treating or otherwise, at any time on or prior to December 31, 2008.  Nor did Dr. Moeser render retrospective diagnoses or any other retrospective opinion regarding the nature or severity of plaintiff's impairments as they existed on or prior to December 31, 2008.  Dr. Moeser's October 2009 assessment addressed only

plaintiff's then-current condition. Because Dr. Moeser was not a medical source on or before the date plaintiff was last insured and did not render a medical opinion regarding plaintiff's functional abilities as they existed during the relevant period, the ALJ was not required to explain in his written decision his treatment of this source's opinion as it related to plaintiff's impairment during the relevant period. Cf. Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991); Ackermann-Papp v. Commissioner of Social Security, No. 1:06-cv-832, 2008 WL 314682, at *2 (W.D. Mich. Feb. 4, 2008). There simply was no opinion rendered by Dr. Moeser regarding plaintiff's medical condition as it existed on the date she was last insured. Cf. Long, 108 F.3d at 187 (Commissioner is required to consider a claimant's medical condition only as of the date she was last insured). Contrary to plaintiff's argument that the opinion is entitled to *controlling* weight in that it was rendered by a treating source, Dr. Moeser was not a treating physician within the meaning of 20 C.F.R. § 404.1527(d)(2) inasmuch as he did not treat plaintiff during the relevant period. See Monette v. Astrue, 269 Fed. Appx. 109, 112-13 (2d Cir. 2008) (citing Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989)).

2. *SSA Single Decision-Maker Allison Egley*

In his decision, the ALJ concluded that plaintiff had the RFC to perform the full range of sedentary work.[22] In making this

---

[22]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket

determination, the ALJ stated that he "considered the opinion of the disability counselor with the Missouri State Agency in the initial determinations. The State Agency concluded that the claimant had greater exertional capabilities than has been determined in this decision." (Tr. 19 (internal citation omitted).) Plaintiff argues that, while acknowledging the opinion rendered by the State agency decision-maker, the ALJ failed to specify the weight accorded to the opinion and that such failure was error. For the following reasons, plaintiff's argument fails.

The Regulations require an ALJ to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist." 20 C.F.R. § 404.1527(f)(2)(ii). A medical consultant must be an "acceptable medical source" identified in 20 C.F.R. § 404.1513(a)(1), (a)(3)-(5), that is, a licensed physician, a licensed optometrist, a licensed podiatrist, or a qualified speech-language pathologist. 20 C.F.R. § 404.1616(b). Only acceptable medical sources can provide medical opinions. Sloan v. Astrue, 499 F.3d 883, 889 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(a)(2)).

files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Here, the State agency's RFC assessment was completed by Allison Egley. Although the assessment states that the form was "completed by Single Decision-Maker," Ms. Egley affixed her typed "signature" in the designated block for a medical consultant's signature, without any indicated title such as M.D., Ph.D., etc. Nor was a medical consultant's code included in the designated block. (Tr. 715.) The Commissioner concedes in his brief that Ms. Egley is a "non-physician single decisionmaker." (Deft.'s Brief, Doc. #9 at p. 14.) Inasmuch as Ms. Egley was not an acceptable medical source, medical consultant or program physician, the ALJ was not required to explain in his written decision the weight accorded to Ms. Egley's opinion.[23] 20 C.F.R. § 404.1527(f)(2)(ii). In addition, while the ALJ considered Ms. Egley's opinion, he properly did not rely on it in making his determination as to plaintiff's RFC. See Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir.

_____

[23]This practice has been called into question by a number of courts with such concern aptly summarized by the District Court of Kansas:

> The court is troubled by the Commissioner's use of RFC Assessment forms completed by "single decision makers" who are not "acceptable medical sources" within the meaning of the regulations but who "sign" the forms by placing their name (without title such as Mr., Ms., M.D., or Ph.D.) in the space designated "Medical Consultant's Signature" and without explanation that they are not an "acceptable medical source," a medical consultant, or any kind of medical professional. This practice leads to errors where ALJ's accept or rely upon the SDM's RFC assessment as a medical opinion.

Kempel v. Astrue, No. 08-4130-JAR, 2010 WL 58910, at *7 (D. Kan. Jan 4, 2010), and cases cited therein.

2007).  Indeed, the ALJ noted specifically that his RFC determination was more restrictive than that offered by Ms. Egley. (Tr. 19.)

Inasmuch as Ms. Egley was a non-physician single decision-maker for disability determinations, the ALJ did not err in his treatment of the RFC assessment completed by her and complied with the Regulations in considering her opinion.

C.  Medical Evidence Supporting RFC Determination

In his decision, the ALJ concluded that plaintiff had the RFC to perform the full range of sedentary work.  Plaintiff claims that the ALJ erred by failing to cite to medical evidence supporting this determination, and by failing to include in the RFC that plaintiff was restricted in the use of her hands.

A claimant's RFC is what she can do despite her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The claimant has the burden to establish her RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Eichelberger, 390 F.3d at 591; Hutsell v.

Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted).

A review of the ALJ's decision and the relevant evidence of record shows the ALJ to have engaged in the proper analysis as to plaintiff's RFC as it existed on or prior to December 31, 2008. Some medical evidence supports the ALJ's determination and, for the following reasons, such determination is supported by substantial evidence on the record as a whole.

First, with respect to the medical evidence, the ALJ noted that subsequent to plaintiff's accident in September 2003, plaintiff underwent treatment for her left knee pain, including medication, knee apparatuses, surgery, and physical therapy; and that plaintiff's condition improved with such interventions. The ALJ noted that in December 2003, plaintiff reported significant pain in the knee with activity, but had no pain at rest and was described by her physical therapist as independent with all activities of daily living. In January and February 2004, plaintiff's physicians and physical therapists noted significant improvement and, indeed, that plaintiff had normal stance, gait, position changes, range of motion, and lower extremity strength. In March 2004, physical examination again yielded normal results and plaintiff reported her pain to be a lot better. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010). In addition, the ALJ noted that plaintiff thereafter sought no treatment until 2006 and reported to her physician then that she experienced pain in her hip after horseback riding. The ALJ noted the treatment notes for plaintiff's complaints of hip and knee pain thereafter to show normal stance, gait and position changes; intact strength of the lower extremities; negative x-rays of the knee; unremarkable results from an MRI of the lumbar spine; improvement after trigger point injections; normal gait; and full

range of motion. The ALJ further noted that subsequent to additional knee surgeries in December 2006 and March 2007, plaintiff indicated a low pain level with pain medication; had improved active range of motion; walked with a normal gait; had full strength in her upper and lower extremities; and consistently reported to her physicians that pain medication provided significant improvement, with the degree of relief estimated at eighty to ninety percent. Finally, the ALJ noted that in May 2009, plaintiff reported to Dr. Moeser that her pain had improved and was at a level two out of ten; and in September 2009, plaintiff had full range of motion of the hips with unremarkable findings. To the extent plaintiff complained in May and September 2009 of discomfort and swelling of her hands and wrists associated with psoriatic arthritis, plaintiff did not exhibit symptoms of the condition or articulate such complaints until after her insured status expired. The ALJ therefore did not err in failing to include any restricted use of the hands in his determination of plaintiff's RFC as it existed on or before December 31, 2008.

The ALJ also discussed the nonmedical evidence of record, noting specifically that plaintiff had returned to work as a babysitter after her accident in 2003; was described as independent in all activities of daily living; cared for a young child and three dogs; engaged in household chores such as laundry, doing dishes, vacuuming, sweeping, gardening, shopping, and banking; and engaged in horseback riding and bowling. The ALJ noted

particularly that "[t]he ability to ride horses and bowl far exceeds the limitations set forth in the above-styled rendered functional capacity." (Tr. 18.)

Finally, the ALJ evaluated the inconsistencies between the evidence of record and plaintiff's subjective complaints of disabling pain, finding specifically that medication and treatment modalities significantly improved plaintiff's pain such that on multiple occasions objective findings of minimal or no impairment were made; that a tendency to overstate symptoms may be present as alluded by one treating physician who noted plaintiff's complaints of pain to be out of proportion to the known injury; that plaintiff's daily activities and demonstrated abilities, including horseback riding and bowling, showed plaintiff's capability to function at the determined RFC level; and that plaintiff's motivation was questionable given the physical therapists' repeated findings that plaintiff was minimally compliant with orders and instructions regarding her rehabilitation scheme. See Gulliams v. Barnhart, 393 F.3d 798, 802-03 (8th Cir. 2005) (effective medication providing relief diminishes credibility of complaints of disabling pain; physician suspected symptom magnification given inconsistency between complaints of pain and objective medical findings; significant daily activities inconsistent with

allegations of disabling pain; failure to follow recommended course of treatment weighs against credibility of complaints).[24]

Upon conclusion of his discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ determined plaintiff's RFC to be consistent with the full range of sedentary work.[25] Because some medical evidence supports this determination, the ALJ's RFC assessment must stand. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. See Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001). Because substantial evidence supports the ALJ's determination, it must be upheld, even if the record could also support an opposite decision. Weikert, 977 F.2d at 1252.

---

[24]Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

[25]See n.22, supra.

D.  Incomplete Findings

Plaintiff also claims that the ALJ's determination is not supported by substantial evidence inasmuch as the ALJ made incomplete findings regarding plaintiff's knee surgeries. Specifically, plaintiff argues that the ALJ stated in his decision that plaintiff had two knee surgeries when the record in fact shows plaintiff to have undergone four.

In his written decision, the ALJ stated that the record showed plaintiff to have had two knee surgeries. (Tr. 17.) A review of the ALJ's decision *in toto* shows, however, that he detailed the circumstances of three knee surgeries, and specifically, those that occurred in December 2003, December 2006 and March 2007. (Tr. 14, 16.) The ALJ did not discuss and failed to refer to plaintiff's knee surgery which occurred in May 2006. An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that it was not considered. Wildman, 596 F.3d at 966. Regardless, the ALJ's misstatement here as to the exact number of surgeries has no bearing on the outcome of this action. The ALJ detailed three of the four surgeries and, with respect to the time frame surrounding the May 2006 surgery, specifically discussed plaintiff's impairment, her complaints related thereto, and her functional abilities as demonstrated by the record. (See Tr. 15-16.) An arguable deficiency in opinion-writing technique does not require an administrative finding to be set aside when that

- 58 -

deficiency has no bearing on the outcome. <u>Hepp v. Astrue</u>, 511 F.3d 798, 806 (8th Cir. 2008).

## VI. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff was not disabled through the date last insured, that is, through December 31, 2008, should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **August 27, 2012.** Failure to timely file objections may result in waiver

of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897

F.2d 356, 357 (8th Cir. 1990).




_____
UNITED STATES MAGISTRATE JUDGE




Dated this  *13th*  day of August, 2012.